**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:98-cr-00159-7 |
| | ) | Judge Trauger |
| PAUL WOODS | ) | |

**MEMORANDUM**

## I. Introduction

Pending before the court is the Defendant's Motion To Compel The Government To File A Rule 35(b) Motion To Reduce Defendant's Sentence Due To Provision Of Extraordinary Assistance In the Investigation And Prosecution Of Dangerous Crime (Docket No. 788), along with supporting briefs and exhibits (Docket Nos. 789, 791, 796, 802, 803, 805, 856, 875). The Government has filed briefs and exhibits in response (Docket Nos. 799, 815, 846, 848, 884) to the Motion. The court held an evidentiary hearing in this case on December 6, 2017. For the reasons set forth herein, the Defendant's Motion To Compel (Docket No. 788) is DENIED.

## II. Procedural Background

### A. The Defendant's Conviction, Sentencing, and Collateral Proceedings

The Defendant was one of 12 defendants named in successive indictments charging drug trafficking and money laundering offenses in this case, which was originally assigned to now-retired Judge Thomas A. Wiseman, Jr. (Docket Nos. 12, 33, 102, 407). On November 29, 2000, the Defendant pled guilty, through a Plea Agreement, to participating in a cocaine trafficking conspiracy and a money laundering conspiracy. (Docket Nos. 474, 552). Judge Wiseman subsequently sentenced the Defendant to a term of life imprisonment on the drug trafficking count, and to a concurrent sentence of 20 years on the money laundering count. (Docket Nos. 545, 553,

568). The Sixth Circuit dismissed the Defendant's direct appeal based on a Plea Agreement provision in which he waived his right to appeal. (Docket No. 636). Robert Marlow represented the Defendant throughout most of the trial court proceedings. (Docket Nos. 316, 596).

The Defendant subsequently filed a collateral action under 28 U.S.C. Section 2255, seeking to vacate his sentence. (Case No. 3:03cv00094); *Paul Allen Woods v. United States*, 398 Fed. Appx. 117 (6th Cir. Sept. 23, 2010). Judge Wiseman presided over the early stages of the Section 2255 case, denying two of the Defendant's three claims. (Docket Nos. 24, 25 in Case No. 3:03cv00094). In ruling on those claims, Judge Wiseman issued a decision in which he recounted the Defendant's conduct during the criminal proceedings:

> Petitioner has appeared before this Court on numerous occasions and this Court has found that Petitioner pervasively obstructs justice. Petitioner lied under oath to the grand jury and suborned perjury when he attempted to get two witnesses to lie at his sentencing hearing.

(Docket No. 24, at 2, in Case No. 3:03cv000094 (footnote omitted); Docket No. 799-4). Judge Wiseman subsequently granted the Defendant's motion to recuse himself. (Docket Nos. 40, 41 in Case No. 3:03cv00094). The case was then randomly reassigned to now-retired Judge William J. Haynes, Jr., who considered the Defendant's third claim. (Docket Nos. 41, 121 in Case No. 3:03cv00094 ); (Docket No. 799-5).

Through the third claim, the Defendant alleged that Assistant United States Attorney ("AUSA") Sunny Koshy and Drug Enforcement ("DEA") Agent James Goodman allowed him to have sexual intercourse in the DEA conference room with one of his girlfriends, Tracy Buford. *Paul Allen Woods v. U.S.,* 398 F. Appx, at 119-24. The Defendant claimed this occurred multiple times during the breaks of his proffer sessions and that his attorney, Mr. Marlow, was present for one of the encounters. *Id.* The Defendant argued that the Government engaged in this conduct to

improperly influence him to enter a guilty plea. *Id.*

After holding an evidentiary hearing, Judge Haynes denied the claim, concluding as follows:

> As to these factual disputes, the Court first credits the testimony of Sunny Koshy, that he was unaware of and did not authorize or condone any of Woods's private visits or sexual contact with Buford. Goodman actually agreed to Woods's brief visits with Buford. Although Woods and his girlfriend had some sexual contact on these visits, the Court credits testimony of Marlow who was in the room at the time of most of these visits, that Woods and his girlfriend did not have sexual intercourse. According to Marlow, Woods and his girlfriend had only a few minutes in the small DEA conference room and sexual intercourse did not occur. There may have been some banter between Woods, his girlfriend and Goodman, but the Court finds that the banter of the sexual nature described by Woods and his girlfriend, did not occur.

(Docket No. 121, at 10, in Case No. 3:03cv94); *Woods v. U. S.,* 398 F. App'x at 122. Judge Haynes determined that there was no causal connection between the Defendant's decision to plead guilty and his visits with Buford. *Id.*, at 127. The Sixth Circuit affirmed on appeal, and the Supreme Court denied the Defendant's petition for writ of certiorari. (Docket Nos. 121, 122, 154, 157 in Case No. 3:03cv00094); *Id.*, at 128.

The Defendant was represented by William Walton during a portion of the Section 2255 proceedings. (Docket No. 80 in Case No. 3:03cv00094). Mr. Walton was replaced by Michael V. Thompson, who was subsequently replaced by Richard L. Tennent. (Docket Nos. 83, 125, 126 in Case No. 3:03cv00094). Mr. Tennent represented the Defendant on appeal of the Section 2255 case. (Docket No. 154 in Case No. 3:03cv00094).

B. The Motion To Compel

On April 27, 2012, the Defendant, through Mr. Tennent, filed the pending Motion To

Compel, in which he requested that the court compel the Government to file a Rule 35(b)[1] motion to reduce his sentence, based on the substantial assistance he provided in a criminal prosecution in the Eastern District of Kentucky, and otherwise, since his incarceration. The Defendant pointed out that AUSA Patrick Molloy, from the Eastern District of Kentucky, had recommended to the United States Attorney for this District that a Rule 35 motion be filed on his behalf. The recommendation, according to the Defendant, was based on his testimony as a crucial trial witness in the prison murder prosecution of Dwaune Gravley, who was a violent felon and the head of a violent prison gang.

---

[1] Rule 35(b) provides, in pertinent part, as follows:

(b) Reducing a Sentence for Substantial Assistance.

(1) In General. Upon the government's motion made within one year of sentencing, the court may reduce a sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person.

(2) Later Motion. Upon the government's motion made more than one year after sentencing, the court may reduce a sentence if the defendant's substantial assistance involved:

(A) information not known to the defendant until one year or more after sentencing;

(B) information provided by the defendant to the government within one year of sentencing, but which did not become useful to the government until more than one year after sentencing; or

(C) information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant.

After Judge Wiseman recused himself, the case was randomly reassigned to now-retired

Judge Todd J. Campbell. (Docket No. 794). Judge Campbell denied the Motion To Compel in a

Memorandum and Order (Docket No. 807) issued on October 18, 2012, which provides, in

pertinent part, as follows:

> In support of his request that the Court compel the Government to file such a motion, the Defendant cites the Sixth Circuit's decision in United States v. Davenport, 465 Fed. Appx 500, 2012 WL 688508 (6th Cir. Mar. 5, 2012) and the Supreme Court's decision in Wade v. United States, 504 U.S. 181, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992). In Davenport, the court outlined the role of the district court in considering the prosecution's failure to file a substantial assistance motion:
>
>> As the Supreme Court has clearly established, 'federal district courts have authority to review a prosecutor's refusal to file a substantial-assistance motion and to grant a remedy if they find that the refusal was based on an unconstitutional motive. Thus, a defendant would be entitled to relief if a prosecutor refused to file a substantial-assistance motion, say, because of the defendant's race or religion.' Wade v. United States, 504 U.S. 181, 185-86, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992). A defendant is also entitled to relief if the prosecutor's refusal to file a substantial-assistance motion is not rationally related to any legitimate Government end. Chapman v. United States, 500 U.S. 453, 464-65, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). However, the defendant has the burden of making a substantial threshold showing: 'a claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing. Nor would additional but generalized allegations of an improper motive.' Wade, 504 U.S. at 186, 112 S.Ct. 1840.
>
> Davenport, 465 Fed. Appx at 503-04.
>
> The Government's Response indicates that the reason for its refusal to file a substantial assistance motion on the Defendant's behalf is the Defendant's breach of his plea agreement; failure to accept responsibility; efforts to obstruct justice; perjury and the making of false allegations; the seriousness of the Defendant's criminal conduct; public safety factors; and lack of timely, full, and truthful cooperation.
>
> As for the Defendant's efforts to obstruct justice and perjury, the Government cites Judge Wiseman's statement at sentencing that he would have required the Government to file a substantial assistance motion at that time ". . . were it not for

his perjured testimony before the grand jury and his attempted [subornation] of perjury." (Docket No. 799-2, at p. 10 of 12). The Government also cites Judge Wiseman's statement at a hearing on the Section 2255 motion describing the Defendant:

> [Woods] has appeared before this Court on numerous occasions and this Court has found that Petitioner pervasively obstructs justice. Petitioner lied under oath to the grand jury and suborned perjury when he attempted to get two witnesses to lie at his sentencing hearing.

(Docket No. 799-4, at p. 3 of 19). In addition, the Government cites Judge Haynes' findings after the evidentiary hearing in the Section 2255 case that the Defendant's testimony was not credible. (Docket No. 799-5).

> Applying the standard set forth in Davenport and Wade to the record in this case, the Court concludes that the Government's refusal to file a substantial assistance motion is not based on an unconstitutional motive, and is rationally related to a legitimate Government end. The Government's refusal is not unwarranted given the Defendant's perjury and obstruction of justice, the finding that his Section 2255 testimony was lacking in credibility, and that he has yet to fully disclose the details of his own past criminal conduct. Accordingly, the Court declines to compel the Government to file a substantial assistance motion, or to hold an evidentiary hearing. The Motion To Compel is DENIED.

(Docket No. 807, at 2-5)(footnote omitted).

The Defendant appealed and, on August 19, 2013, the Sixth Circuit issued a decision vacating Judge Campbell's order and remanding the case for further proceedings. (Docket No. 821). On appeal, the Defendant argued that the Government had "bargained away" its discretion to file a Rule 35 motion through the actions of AUSA Molloy. (Id., at 8). The court rejected the Government's argument that this claim was waived because the Defendant did not raise it in the district court: "Instead, we address the issue and conclude that, given the peculiarities of this case, the district court's denial of Woods's motion to compel must be vacated and the case remanded for further proceedings." (Id., at 10). The court explained that its conclusion was based on the following:

This result is appropriate here for several reasons. First, the district court did not address this argument in its opinion beyond stating that Woods 'points out' the existence of the letter. R. 807 (D. Ct. Op. at 2) (Page ID # 847). Thus, it appears that the district court might have improperly applied the law by failing to recognize that the government cannot refuse to file a Rule 35(b) motion if it bargained away its discretion to do so. *See Benjamin*, 138 F.3d at 1073–74. Second, although the colloquy between AUSA Molloy and Woods appears to be evidence that the government did not bargain away its discretion to file a Rule 35 motion prior to Woods's testimony, we agree with Woods that it is ambiguous enough that it does not control the outcome of this case. Furthermore, it seems unlikely that AUSA Molloy would have made an unconditional promise to file a Rule 35 motion prior to weighing the value of Woods's testimony (which might have included waiting for the jury's verdict). Therefore, it is possible that AUSA Molloy promised to file a Rule 35 motion after Woods testified. Finally, whether the government actually bargained away its discretion is an issue of fact that can be resolved with minimal discovery and a hearing. We leave the contours of discovery and a hearing to the district court, but we note, as Woods did in his response to the government's opposition to his motion to compel, that the letter from the U.S. Attorney's Office for the Eastern District of Kentucky to the U.S. Attorney's Office for the Middle District of Tennessee and testimony from AUSA Molloy could prove controlling. For these reasons and the unique facts presented by this case, we vacate the district court's denial of Woods's motion to compel and remand for further proceedings.

(Id., at 10-11).

The appeals court then considered the Defendant's argument that he had made a substantial showing that the Government's refusal to file a Rule 35 motion was based on an unconstitutional motive – retaliation for filing a Section 2255 action. The court concluded that the case should be remanded because the district court abused its discretion in failing to determine whether the Defendant had made such a substantial showing:

Woods requested that the district court 'grant an evidentiary hearing where the full basis of the government's denial can be ascertained, and where the full extent of Mr. Woods' assistance can be presented.' R. 789 (Memo in Support of Mot. to Compel at 18) (Page ID # 206). Our precedents make clear that a hearing is appropriate when '[a] defendant ... makes a substantial threshold showing of an unconstitutional motive.' *Bagnoli*, 7 F.3d at 92. Rather than analyzing whether Woods made a substantial threshold showing, the district court examined the government's proffered reasons for refusing to file such a motion. See R. 807 (D. Ct. Op. at 4–5) (Page ID # 849–850). Thus, the district court skipped an important determination: whether Woods was entitled to a hearing based on a substantial

threshold showing that the government's motive was unconstitutional. Because the failure to make this determination was an abuse of the district court's discretion, we vacate the district court's denial of Woods's motion to compel and remand for further proceedings.

(Id., at 12).

After remand, this matter was set for hearing repeatedly over the ensuing four years. During that time, the Defendant has been represented by four successive attorneys: Mr. Tennent, Kimberly S. Hodde, David L. Cooper, and Robert Lynn Parris. Mr. Parris currently represents the Defendant. Upon the retirement of Judge Campbell, the case was randomly reassigned to the undersigned Judge on December 16, 2016.

## III. Analysis

### A. Substantial Threshold Showing

As explained in the Sixth Circuit's opinion remanding this case, federal courts have authority to review a prosecutor's refusal to file a motion for sentence reduction based on substantial assistance if the prosecutor's refusal is based on an unconstitutional motive, like the defendant's race or religion. (Docket No. 821, at 9-10) (*citing Wade v. United States*, 504 U.S. 181, 185-86, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992)). The Sixth Circuit has also held that a defendant is entitled to relief if the prosecutor's refusal to file a substantial assistance motion is not rationally related to any legitimate government end. *United States v. Davenport*, 465 F. App'x 500, 503 (6th Cir. 2012). A defendant has a right to a hearing on the issue, however, only if he makes a "substantial threshold showing" that he satisfies these standards. (Docket No. 821, at 10); *United States v. Bagnoli*, 7 F.3d 90, 92 (6th Cir. 1993).

In evaluating a prosecutor's motives for refusing to file a substantial assistance motion, the Sixth Circuit has held that the existence of an independent, constitutional ground for the

government's refusal precludes a defendant from making the "substantial threshold showing." *United States v. Washington*, 250 F. App'x 716, 719 (6th Cir. 2007)(citing *United States v. Capps*, 140 F. App's 911 (11th Cir. 2005)). Similarly, the Third Circuit has held that, in order to prove prosecutorial vindictiveness in the refusal to file a substantial assistance motion, a defendant "must show that the prosecutor withheld a 5K1.1 motion *solely* to penalize him for exercising his [constitutional right]." *United States v. Paramo*, 998 F.2d 1212, 1221(3rd Cir. 1993)(emphasis added). *See also United States v. Gomez*, 705 F.3d 68, 79 (2nd Cir. 2013)(citing *Paramo* for this proposition).

In this case, the Defendant initially argued that the Government's refusal to file a Rule 35(b) motion on his behalf was motivated by its desire for retaliation for the Defendant's having filed a Section 2255 case. On appeal, the Government did not dispute that such a motive would qualify as an unconstitutional one. (Docket No. 821, at 11 n. 3). The Defendant argues that he has made a "substantial threshold showing" that the Government harbored this unconstitutional motive based on the following: (1) the Defendant was treated in a manner radically unlike similarly-situated defendants; (2) the Defendant's false allegations, which are relied upon by the Government to support its refusal, were made in the Section 2255 case; and (3) there is no other rational reason to deny Rule 35 relief to the Defendant. (Docket No. 856).

As to the first argument, the Defendant contends that he has provided more and received less than other defendants who were rewarded with a Rule 35 motion. The Defendant claims that those similarly-situated defendants are Juan Canela, Karen Sue Holloway, Sonji Howard and Anthony Bowers. According to the Defendant, the only factor distinguishing him from these defendants is his having filed a Section 2255 case. While there appear to be similarities between the Defendant and his descriptions of these defendants, however, the court is not persuaded that the

only distinguishing factor between them and the Defendant is his having filed a Section 2255 case. For example, the Government may have determined that the Defendant is not similarly situated to Mr. Canela, Ms. Holloway, and Ms. Howard because they do not appear to have been found by a judge to have committed perjury.

As described by the Defendant and as revealed by the court record, Mr. Bowers' situation is more complicated. Mr. Bowers was initially denied a Rule 35 sentence reduction by Judge Campbell because he had engaged in an assault on another inmate while a Rule 35 motion was pending. (Docket Nos. 802-6, 802-7). In reaching his decision, Judge Campbell found Mr. Bowers' testimony about the prison assault not to be credible. (Docket No. 802-7, at 5 of 9). Several years later, Mr. Bowers filed a motion for sentence reduction based on a retroactive sentencing guideline amendment, and the Government filed a response opposing the defense request for a sentence below the mandatory minimum imposed by statute. (Docket No. 802-8; Docket No. 157 in Case No. 3:00cr75). Judge Campbell held a resentencing hearing and imposed the mandatory minimum sentence. (Id., at 37). At that resentencing hearing, Mr. Bowers discussed his journey to rehabilitation over the previous four years. (Id., at 38-42). At the conclusion of that hearing, AUSA Koshy commented on the apparent change in Mr. Bowers, and Judge Campbell stated that Mr. Bowers "made some heartfelt statements" and "[c]ould have a bright future if he applied himself properly." (Id., at 43-44 ).

Several months later, the Government filed a motion recommending a sentence reduction for Mr. Bowers below the statutory mandatory minimum, citing Mr. Bowers' "exemplary allocution" at the resentencing hearing and his having testified in a state murder trial without expecting a benefit in return. (Docket No. 164 in Case No. 3:00cr75). Judge Campbell granted the motion and reduced Mr. Bowers' sentence as requested. (Docket No. 169 in Case No. 3:00cr75).

In the court's view, as of the time the Government agreed to a sentence reduction for Mr. Bowers, his situation was no longer similar to the Defendant's situation. In comparing the two, the Government may have determined that, unlike Mr. Bowers, the Defendant's credibility and rehabilitation remain in doubt.[2]

Next, the Defendant argues that his filing of a Section 2255 case motivated the Government to deny his Rule 35 motion because the false statements it relies on in denying relief were made by the Defendant in a Section 2255 case. The *filing* of a Section 2255 case, however, is not the same as *lying* during the course of litigating the case. The Defendant has not established that making false statements in a court proceeding is constitutionally-protected conduct.

Finally, the Defendant argues that his filing the Section 2255 case motivated the Government to deny him relief because there is no other rational reason for it to do so. The record demonstrates, however, that the reasons articulated by the Government – the Defendant's breach of his plea agreement, failure to accept responsibility, efforts to obstruct justice, perjury and the making of false allegations, the seriousness of the Defendant's criminal conduct, public safety factors, and lack of timely, full, and truthful cooperation – are rational ones and serve the legitimate goal of deterring such conduct.

Thus, the court concludes that the Defendant has failed to make a substantial threshold showing that the Government's refusal to file the Rule 35 motion was in retaliation for his having filed a Section 2255 case. Federal inmates routinely file Section 2255 cases, and the Defendant

---

[2]   As set forth herein, the Defendant continues to deny Judge Wiseman's finding that he tried to persuade witnesses to lie at his sentencing hearing.  He also denies that he lied in his Section 2255 testimony that he had sex with his girlfriend between four and seven times in the DEA conference room with the knowledge and agreement of his attorney, a DEA agent, and AUSA Koshy, although Judge Haynes found that this allegation was not true.

has not shown that the Government felt compelled to punish him simply because he did so.

B. Bargained-Away Discretion

    1. *The Evidence Presented by the Parties*

In its opinion remanding this case, the Sixth Circuit held that "the government's refusal to file a Rule 35(b) motion should be overturned if the government agreed to file such a motion in exchange for the defendant's cooperation." (Docket No. 821, at 9)(*citing United States v. Benjamin*, 138 F.3d 1069, 1073-74 (6th Cir. 1998)). Making the determination of whether the Government, through Mr. Molloy, actually bargained away its discretion in this case, the court explained, is an "issue of fact that can be resolved with minimal discovery and a hearing." (Docket No. 821, at 11). This court held such a hearing on December 6, 2017, and the Defendant called three witnesses to testify on this issue: Mr. Molloy, Mr. Tennent, and the Defendant.

Through his testimony, Mr. Molloy recounted his considerable experience as a career federal prosecutor, including a stint as United States Attorney, until his retirement from federal practice in 2015. During the events at issue here, in 2011, Mr. Molloy was an AUSA in the Eastern District of Kentucky, assigned to a special litigation unit handling crimes occurring in the five federal correctional facilities located in Kentucky. In that position, Mr. Molloy explained, he frequently used inmate witnesses in the trial of his cases, and those inmates commonly asked for Rule 35 sentence reductions. As a result, Mr. Molloy testified, he had developed a process for handling an inmate's request for a Rule 35 motion: first, he told the inmate he would need to contact the prosecutor in the district where the defendant was sentenced to advise the prosecutor about the assistance provided; second, that prosecutor would need to agree to file the motion; and third, the sentencing judge would make the ultimate decision about whether to grant the motion and reduce the sentence. According to Mr. Molloy, he never promised an inmate that a Rule 35 motion

would be filed on his or her behalf, as he had no standing to do so.

During his work in the special litigation unit, in 2011, Mr. Molloy was involved in the prosecution of inmates Dwaune Gravley and Darryl Milburne, who were charged with brutally murdering another inmate, Shamoni Peterson. Mr. Milburne pled guilty to second degree murder, and Mr. Gravley went to trial. Mr. Molloy called the Defendant to testify during the case-in-chief about conversations he had with Mr. Gravley when they were cellmates at some point after the murder occurred. During those conversations, Mr. Gravley told Woods that he had ordered Mr. Milburne to carry out the hit on Mr. Peterson.

In his defense case, Mr. Gravley called Mr. Milburne, who testified that he murdered Mr. Peterson on his own and that Mr. Gravley had no involvement in the murder. Mr. Molloy called the Defendant to testify on rebuttal to statements made by Mr. Milburne prior to trial during a flight with the Defendant on the United States Marshal's air transport plane. During the flight, Mr. Milburne said he planned to commit perjury and provide Mr. Gravley with a defense to the murder charge. The jury ultimately convicted Mr. Gravley on all of the charges against him.

Mr. Molloy testified that, in his opinion, the Defendant's assistance in the Gravley trial was exceptional. He described the Defendant's testimony at the trial as credible, accurate, and honest. He also explained that "snitching" on another inmate, as the Defendant had done, is tantamount to signing your own death warrant. Mr. Molloy pointed out that Mr. Gravley was especially inclined to retaliate, as evidence indicated that he made threats on the lives of the prosecutors as well as others involved in the case. Mr. Gravley made some of these threats in the presence of the Defendant, and the Defendant passed those on to the prosecutors.

Mr. Molloy testified that, prior to his testimony in the case-in-chief in the Gravley trial, the Defendant had not requested a sentence reduction. Mr. Molloy said the Defendant repeatedly told

him that he was offering his assistance because he wanted to "do the right thing." A Memorandum of Investigation, entered in the record by the parties, documents the first pretrial interview of the Defendant with Mr. Molloy and others, on January 19, 2011. (Docket No. 846-1, at 11 of 21). Prior to the interview, according to the Memorandum, the Defendant was advised as follows:

> . . . that the interview was voluntary, that Woods could refuse to answer any questions or end the interview at any time, *and that no promises or guarantees would be made to Woods to get his cooperation*. Woods was advised that options such as a Rule 35 sentence reduction and placement in a protection program were possibilities, but that *sentence reductions were ultimately up to the district where Woods was convicted*, and given that Woods was currently serving a life sentence, it was possible that Woods' sentence would be unchanged, even if Woods did cooperate with the government.

(Id., at p. 11 of 21) (emphasis added). The Memorandum then states that the Defendant agreed to be interviewed, stating "'I'm ready to move forward.'" (Id.). At the end of the interview, according to the Memorandum, the Defendant stated that his motivation for coming forward was that he "'just wanted to do the right thing.'" (Id., at p. 16 of 21).

In a later meeting, Mr. Molloy testified, the Defendant suggested that he did not believe he was eligible for a Rule 35 sentence reduction because he was serving a life sentence. Mr. Molloy testified that he did not know if that was true but that he did not independently research the issue.

In the direct examination of three other inmate witnesses at the trial, Mr. Molloy acknowledged that he spelled out in some detail the process of obtaining a Rule 35 sentence reduction, including the requirement that the inmate's local prosecutor would need to agree to file the motion in the district where the inmate was sentenced. (Docket Nos. 875-4, 875-5, 875-6). Mr. Molloy testified that he did not discuss the Rule 35 process in the direct examination of the Defendant, because the Defendant had not asked for a motion to be filed. (Docket No. 815-3). Indeed, Mr. Molloy confirmed during the Defendant's testimony that the Defendant believed he

was not eligible for a Rule 35 motion because he was serving a life sentence. (Id., at p. 6-7 of 8).

Mr. Molloy testified that, after Mr. Gravley called Mr. Milburne to testify that Mr. Gravley was not involved in the murder, Mr. Molloy realized that he would need to call the Defendant in rebuttal to testify about his conversation with Mr. Milburne during their flight together. According to Mr. Molloy, Mr. Gravley completed the examination of Mr. Milburne and rested his case shortly before the lunch break. Over that break, Mr. Molloy testified, he met with the Defendant in the holding cell to discuss the Defendant's rebuttal testimony.

Mr. Molloy testified that he spoke with the Defendant for somewhat less than an hour and told him that he needed his testimony on rebuttal relating to Mr. Milburne's statements about his plans to commit perjury in order to help Mr. Gravley. Mr. Molloy testified that the Defendant asked about obtaining a Rule 35 sentence reduction, and Mr. Molloy said he explained the multi-step process, which involved contacting the Defendant's local prosecutor to advise him about the assistance provided, the local prosecutor deciding whether to file the motion, and the sentencing judge making the ultimate decision about whether to grant the motion and reduce the sentence. Mr. Molloy testified that he told the Defendant he did not have time, at that point in the trial, to contact the prosecutor in the Defendant's home district prior to calling him to testify, as he had done with the other cooperating defendants who had asked for sentence reduction motions before the trial.[3] Mr. Molloy adamantly denied promising the Defendant that a Rule 35 would be filed in exchange for his agreeing to testify on rebuttal and was equally adamant that it would not have "slipped by

---

[3] Defense counsel asked Mr. Molloy about a letter he had sent regarding inmate security prior to trial stating that the Defendant, like other cooperating inmates, "hopes to get a Rule 35 sentence reduction and to be placed in a safe institution." (Defendant's Exhibit 1, at p. 3). Mr. Molloy testified that he made that statement in error and that the Defendant had not asked for a Rule 35 until immediately prior to his rebuttal testimony. The Defendant's testimony is consistent with Mr. Molloy's on that point.

him" to tell the Defendant about the role of the local prosecutor in the process. Mr. Molloy testified that he did not remember the Defendant ever saying he would refuse to testify unless such a promise was made.

During the Defendant's rebuttal testimony, Mr. Molloy asked about the Defendant's hope that he would receive a sentence reduction:

> Q.  First of all, Mr. Woods, now that you have thought about it perhaps more, what do you *anticipate or hope* that the government might do for you as a result of your testifying in this case?
>
> A.  Receive a Rule 35 and be placed in the witness protection program.
>
> Q.  All right. Now with regard to the Rule 35, were you at once under the impression that because you are doing a life sentence, that you cannot receive a Rule 35?
>
> A.  Yes.
>
> Q.  Do you understand that that is not the case, that is not the way it works –
>
> A.  Yes, sir.
>
> Q.  – that you can?  What do you understand the Rule 35 to be?
>
> A.  Well, the government, *they haven't made any promises*. They can only recommend and file a Rule 35. And there is nothing guaranteed. It is up to my sentencing judge whether or not a Rule 35 is even granted or if I receive a time cut.
>
> Q.  *I can recommend it*; is that correct?
>
> A.  Yes, sir.
>
> Q.  But it is ultimately up to the judge. I think you were out of Nashville, Tennessee?
>
> A.  Yes, the Middle District of Tennessee.
>
> Q.  All right. Anything else that you had requested or any other kind of benefit that you hope to receive?
>
> A.  No, sir.

(Docket No. 815-4, at 80-82) (emphasis added).

Mr. Molloy testified that this exchange with the Defendant was intended to inform the jury about the Defendant's potential bias. According to Mr. Molloy, he did not ask about the Rule 35 process in detail with the Defendant on rebuttal because the Rule 35 process had already been thoroughly discussed through the testimony of three other inmate witnesses during the case-in-chief. It was not helpful to the jury at this point, Mr. Molloy testified, to hear about the detailed process for a fourth time in order for them to evaluate the Defendant's credibility.[4]

After the trial,[5] Mr. Molloy called AUSA Koshy to advise him about the Defendant's assistance in the Gravley case. During that phone call, Mr. Molloy testified, he learned for the first time that the Defendant had committed perjury in front of the grand jury, that he had made false accusations about the AUSA, that he was probably the largest cocaine dealer in Nashville up to that time, that he was a fugitive for a time, and that he had considered having his face altered. Had he known of these issues, Mr. Molloy testified, he might not have called the Defendant to testify at the Gravley trial, noting that this negative information likely would had to have been disclosed to the defense as *Brady* material.

After he learned of these issues, Mr. Molloy testified, he disclosed them to Mr. Gravley, who used them as a basis for requesting a new trial. That motion was ultimately denied, according to Mr. Molloy, because the judge concluded that the Defendant was not a crucial witness, and the Sixth Circuit agreed. Mr. Molloy testified that, in his opinion, the Defendant's testimony was

---

[4] The Defendant here is affirming, under oath, before the jury, that no promises have been made to him. If promises had been made, the Defendant would have been committing perjury with this testimony, and Mr. Molloy would have been knowingly presenting false testimony before the court.

[5] The trial lasted two weeks – from March 21, 2011 to April 1, 2011. (Docket No. 846-1, at 2 of 21 n. 2).

important, but it is likely the jury would still have found Mr. Gravley guilty, even without the Defendant's testimony.

A few days after speaking with Mr. Koshy, Mr. Molloy sent a letter, dated April 8, 2011, on behalf of the four inmate witnesses who testified at the Gravley trial to each of their home prosecutors, detailing the assistance they provided and recommending that they each receive a Rule 35 sentence reduction. (Docket No. 846-1). The Defendant's assistance was detailed in the letter, and AUSA Koshy was one of the prosecutors to whom the letter was addressed. Mr. Molloy testified that he does not recall whether he sent a copy of the letter to Defendant's counsel, Mr. Tennent, with whom he had been in contact.

Mr. Molloy testified that he received no response to the letter from the Defendant's home prosecutor for some time, and he continued to contact that office on the Defendant's behalf. Mr. Molloy said he continued to stress the risks to the Defendant's safety that resulted from his having testified.

While his request to Mr. Koshy was pending, Mr. Molloy received a letter from the Defendant, dated September 7, 2011. (Docket No. 875-8). In that letter, the Defendant indicates that he is writing "to express my heartfelt appreciation for all that you and your office have done on my behalf in securing my safety and filing the Rule 35." (Id., at 1). The Defendant also thanked Mr. Molloy for giving him the opportunity to testify in the Gravley trial, as it allowed him to repay some of his debt to society and to do "the right thing." (Id., at 2). Much of the letter relates to the Defendant's description of the changes he had experienced during his incarceration, in an effort to counter "the negative things you may have heard about me from my prosecutor
. . . " (Id., at 2). In closing, the Defendant states:

> I know at this point it's very limited as to what you can do. Mr. Malloy, I continue

to need your help. If you can find it in your heart to continue to assist me, I promise
that your assistance will not be in vain.

(Id., at 3). In a postscript, the Defendant indicates that he is preparing to send a letter to Mr. Koshy
"to offer my sincere apology to him for the way that I acted during my criminal proceedings." (Id.).


After he received the letter, Mr. Molloy received a call from the Defendant, on October 17,
2011, during which he took notes. (Government's Exhibit 1). During that call, Mr. Molloy said he
indicated there was nothing new on the Rule 35, and the Defendant said he had sent a letter to the
AUSA in Nashville but had not yet received a reply. Mr. Molloy testified that the Defendant did
not say he believed Mr. Molloy had already filed a Rule 35 motion on his behalf.

Eventually, Mr. Molloy testified, AUSA Koshy called him, on April 19, 2012, to advise
that, after a thorough review, his office would decline to file a Rule 35 motion on the Defendant's
behalf. (Government's Exhibit 2).

Mr. Molloy testified that, several months later, he received another letter from the
Defendant, dated March 15, 2013. (Government's Exhibit 3). In that letter, for the first time
according to Mr. Molloy, the Defendant accused him of failing to follow through on his agreement
"prior to and on the record of the Gravley trial" to file a Rule 35 motion on the Defendant's behalf
in his home district in exchange for the Defendant's rebuttal testimony. (Id., at 1). The letter then
went on to cite Sixth Circuit caselaw that the Defendant had discovered, indicating that the
government's discretion with regard to Rule 35 motions would be circumscribed when it is used
"as a bargaining chip in the negotiation process." (Id., at 2).

Mr. Molloy testified that the Defendant's statement in the letter that he had promised he
would file a Rule 35 motion in exchange for the Defendant's rebuttal testimony was "patently

inaccurate." According to Mr. Molloy, the Defendant had never stated that he would refuse to testify unless Mr. Molloy promised to file a Rule 35 motion.

In a letter he sent to the Defendant in response, on March 28, 2013, Mr. Molloy denied in detail the Defendant's allegation about the pre-rebuttal testimony meeting:

> . . . After Milburne testified on Defendant Gravley's side of the case, I met with you in the Marshal's holding cell in the London Federal Courthouse to discuss you testifying in rebuttal. On that occasion and for the first time you mentioned you wanted a Rule 35.
>
> I carefully explained what I could and could not do regarding a Rule 35, and how I would proceed. I told you that following your testimony I would make a request to your original prosecuting attorney's office and to the prosecutor of your case advising him/her of the extent of your cooperation and of your testimony. I carefully explained that it would be up to that office and to that prosecutor to decide whether or not to actually file a Rule 35 motion with your trial judge. And finally, if the prosecutor of your case filed a Rule 35 motion with your trial judge, it would ultimately be up to the judge whether or not to grant the Rule 35 sentence reduction, and to what extent to reduce your sentence.
>
> In other words I told you very clearly it would be a three step process. . .
>
> * * *
>
> I did exactly as I told you I would. After the case was concluded, I called AUSA Sunny Koshy on several occasions. I sent him materials per his requests about your cooperation and your trial testimony. After several weeks or perhaps months, he contacted me and advised me that he and his office in Nashville had decided not (sic) file a Rule 35 motion notwithstanding my request.
>
> During that time period, you called me several times and I reported to you that I had been in touch with AUSA Koshy. Further I reported to you that AUSA Koshy told me that you and he had difficulties, and at your sentencing that the Judge had criticized you for making false statements before the grand jury there in Nashville. You acknowledged that you and AUSA Koshy had difficulties and the Judge had differences with you. Finally, I told you that I had done all I could do on your behalf with AUSA Koshy, and that I did not have a good feeling about your chances with him or with the Judge. . . .

(Docket No. 846-2).

Mr. Molloy testified that, after the remand in this case, on August 23, 2013, he sent a letter

to the Acting United States Attorney for the Middle District of Tennessee, in which he confirmed that he never promised to file a Rule 35 motion on behalf of the Defendant. (Docket No. 846-3).

As his next witness, the Defendant called his former attorney, Mr. Tennent. Mr. Tennent testified that he began his representation of the Defendant during the appeal of the Defendant's Section 2255 case in 2006 or 2007. Mr. Tennent said he became aware that the Defendant was cooperating in the Gravley prosecution and sometimes communicated with the prosecutors, occasionally passing on information from the Defendant. Mr. Tennent acknowledged that he did not advise the prosecutors in Kentucky about the Defendant's committing perjury in the Tennessee proceedings, and he did not advise AUSA Koshy that the Defendant was cooperating in the Gravley trial.

Mr. Tennent explained that he was new to the federal system and the Rule 35 process at that point, noting that in his experience in state court, cooperators did not reach deals for sentence reductions prior to their cooperation. Mr. Tennent said he advised the Defendant to cooperate out of the goodness of his heart and trust that he would later be rewarded for that cooperation. He acknowledged that as an error on his part. Mr. Tennent testified that he assumed that, if another prosecutor recommended that a Rule 35 motion be filed, the home prosecutor would do so.

Mr. Tennent testified that, when he learned of the Defendant's statement on direct examination in the Gravley trial that a life sentence made him ineligible for a Rule 35 motion, he was perplexed, because he and the Defendant had been talking about getting a Rule 35 for years – at least since March 2009.

Mr. Tennent testified that he believes he spoke with the Defendant before the Defendant testified on rebuttal in the Gravley trial, but he cannot recall the conversation. According to Mr. Tennent, Mr. Molloy called him some time later, on April 4, 2011, to tell him that the Defendant

had done a good job during the trial. Mr. Tennent said he recalls that, at some point after the trial, Mr. Molloy mentioned that the Rule 35 motion had come up but that he is not sure exactly what Mr. Molloy said about that. Mr. Tennent said his best recollection was set forth in a motion he filed earlier in this case:

> a. Mr. Molloy told counsel that he was rushed for time (as his letter represents) and that the issue of a Rule 35 came up on the eve of recalling Mr. Woods as a rebuttal witness.

> b. Due to the rush of time, Mr. Molloy did not have time to contact the relevant Assistant US Attorney in the Middle District of Tennessee, as would have been his normal course of conduct.

> c. Mr. Molloy was not certain exactly what he told Mr. Woods about the Rule 35 process. It was his normal practice to fully explain the process (including the role of the local US Attorney), and he 'suspected' or 'believed' he 'would have' told Mr. Woods this information. However, he did not remember exactly what he said.

> d. Mr. Molloy was sure he did not 'promise' that Mr. Woods would receive a sentencing reduction. However, again, he did not remember exact words.

(Docket No. 853, at 3-4). Mr. Tennent testified that Mr. Molloy has always denied making a promise to the Defendant that he (Molloy) would file the Rule 35 motion.

On June 15, 2011, Mr. Tennent sent a letter to Jerry Martin, the United States Attorney for the Middle District of Tennessee at that time, and requested a Rule 35 motion be filed, based on the Defendant's cooperation and assistance in the Gravley trial and other matters. (Docket No. 791-1). In the letter, Mr. Tennent states that Mr. Molloy likely has provided more detailed information about the Defendant's assistance, and "[Mr. Molloy] has told Mr. Woods that he would send your office a Rule 35 recommendation letter." (Id., at p. 3 of 6). Mr. Tennent testified that, prior to writing this letter, both the Defendant and Mr. Molloy told him that Mr. Molloy would be sending the Rule 35 recommendation letter to the Nashville U.S. Attorney's Office. Based on his conversations with Mr. Molloy and the Defendant, Mr. Tennent testified, his

understanding was that the Nashville U.S. Attorney's Office retained full discretion to decide whether to file a Rule 35 motion.

Mr. Tennent sent another letter to Mr. Martin on July 21, 2011, as a follow-up to his earlier letter, and described assistance the Defendant had provided to a prosecutor in New Jersey. (Docket No. 791-4). Mr. Tennent testified that this information was provided to him by the Defendant in a telephone call on July 15, 2011, and that the Defendant knew he was sending these letters.

According to Mr. Tennent, he spoke with the Defendant on December 22, 2011 about sending a final letter to Mr. Martin before filing a motion to compel. Mr. Tennent sent that letter on February 3, 2012. (Docket No. 791-5). In the letter, he again appeals for the Rule 35 motion to be filed and references a letter of apology that had been sent by the Defendant to AUSA Koshy. Mr. Tennent testified that he talked with the Defendant on February 8, 2012, and told him he had sent the final letter to Mr. Martin. Mr. Tennent said he believes he sent copies of these letters to the Defendant but does not know if he received them because the Defendant was in the witness security program.

Mr. Tennent testified that he spoke with the Defendant on April 20, 2012 about the specifics of the motion to compel he planned to file. Mr. Tennent filed the motion on April 27, 2012. (Docket No. 788).

Mr. Tennent testified that it was not until June 28, 2012 that he understood the Defendant's position to be that Mr. Molloy promised to file a Rule 35 in exchange for the Defendant's rebuttal testimony. In that regard, Mr. Tennent testified that the Defendant had repeatedly urged him to look at the transcript of the Rule 35 discussion he had with Mr. Molloy at the beginning of his rebuttal testimony. Mr. Tennent said he initially told the Defendant that this was a losing argument because

he would not win a swearing contest with an AUSA, given his history of committing perjury.

Mr. Tennent testified that he spoke with the Defendant 15 times between the Gravley trial and June 28, 2012. During that time, Mr. Tennent testified, the Defendant did not ask him why he was trying to persuade the Nashville U.S. Attorney to file a Rule 35 motion (since the Defendant maintained that the motion had already been filed by Mr. Molloy), nor did he say that he had been promised a Rule 35 motion by Mr. Molloy.[6]

The Defendant was the final witness at the evidentiary hearing. He testified that he initially attempted to cooperate in his criminal case but that AUSA Koshy did not file a 5K substantial assistance motion because the Defendant breached the plea agreement. The Defendant explained the events leading up to his hearing the statements of Mr. Gravley, to which he testified in the case-in-chief at the Gravley trial, and the process of passing that information on to the authorities.

The Defendant testified that he requested a sentence reduction during his first meeting with a federal agent named Spahn in 2009 and that Agent Spahn told him he would have to talk to a prosecutor in the Eastern District of Kentucky.

Thereafter, the Defendant said he learned that Mr. Gravley was going to plead guilty, and the Defendant was transported to a facility outside Kentucky. Some time later in 2010, the Defendant testified, he was transported back to Kentucky. It was on this trip that he overheard Mr. Milburne make the statements about his plans to commit perjury and exonerate Mr. Gravley.

When he arrived in Kentucky, the Defendant said, he called Mr. Tennent to see if he could find out why he had been transported there. In a later call, the Defendant said Mr. Tennent told him

---

[6]  Mr. Tennent testified that, if the Defendant had told him that Molloy had promised the filing of a Rule 35 motion, he would have put *that* in his notes, and those words were not in his notes. He also said he would not have written the letters that he did, requesting the local office to file the motion.

that he had spoken with Mr. Molloy and that Mr. Molloy wanted to talk with the Defendant. According to the Defendant, Mr. Tennent said Mr. Molloy asked what the Defendant wanted for his testimony. The Defendant testified that Mr. Tennent advised him not to ask for anything and to just speak out of the kindness of his heart, which would bolster his credibility. The Defendant said he did not agree with Mr. Tennent, but he took his advice and did not ask for anything.

In his first meeting with Mr. Molloy, in January, 2011, the Defendant testified, they discussed Mr. Gravley and the possibility that the Defendant would be placed in witness protection in prison. The Defendant said he told Mr. Molloy he was cooperating out of the kindness of his heart, as Mr. Tennent advised. In a second meeting, in March, 2011, the Defendant met with Mr. Molloy to discuss Mr. Milburne.

The Defendant testified that it was during the third meeting, prior to testifying in the case-in-chief, that the topic of a Rule 35 motion came up. The Defendant testified that he was in the holding area with other inmate witnesses at the time, and Mr. Molloy came in and talked with all of them. The Defendant testified that Mr. Molloy told the other inmate witnesses that Mr. Gravley was representing himself and that they should testify that all they had been promised was a Rule 35 motion. The Defendant testified that Mr. Molloy told him to testify that all he had been promised was witness protection, as he was not eligible for a Rule 35 motion since he was serving a life sentence. The Defendant testified that he assumed Mr. Molloy was correct about his ineligibility and that Mr. Tennent was wrong, since Mr. Molloy was a seasoned prosecutor. According to the Defendant, Mr. Molloy did not discuss the three-step Rule 35 process at this time.

After his testimony was completed, the Defendant said he was taken back to the Fayette County jail in a van with the other inmate witnesses. According to the Defendant, the other inmates were surprised that Mr. Molloy would give out a Rule 35 motion so easily. When he arrived at the

jail, the Defendant testified, he called Mr. Tennent and Mr. Tennent told him that his life sentence did not render him ineligible for a Rule 35 motion.

On March 31, 2011, the Defendant said he was told he was being transferred back to Atwater prison. He said he told the transport officers that his life would be in danger at that facility and they should call the prosecutor. Before boarding the plane en route to Atwater, the Defendant was transported back to the holding area for the Gravley trial. The Defendant testified that Mr. Molloy visited him there and said: "Paul, I need you." According to the Defendant, Mr. Molloy explained that his case was in jeopardy because Mr. Milburne had testified that he acted alone and that Mr. Gravley was not involved in the murder. The Defendant said he then told Mr. Molloy that, unless he filed a Rule 35 motion, the Defendant would refuse to testify. According to the Defendant, Mr. Molloy responded: "Okay, Paul, I promise to give you a Rule 35. . . . I will file the motion with the district court," but Molloy did explain that it would ultimately be up to the judge.

The Defendant testified that Mr. Molloy never explained the three-step process for obtaining a Rule 35 sentence reduction. If he had explained that process, the Defendant said he would not have testified, because he knew that AUSA Koshy hated him and would not file the motion. The Defendant said he would not have testified unless Mr. Koshy and Mr. Tennent were "on board." The Defendant said that Mr. Molloy used the term "government" when he made the promise and did not limit himself to the Eastern District of Kentucky. The Defendant testified that no one else heard this conversation and estimated that this meeting lasted only three to five minutes. The Defendant acknowledged that Mr. Molloy did not know anything about his underlying case when he made the promise to file the Rule 35 motion.

After he testified on rebuttal and returned to the Fayette County jail, the Defendant said he

called Mr. Tennent and told him that Mr. Molloy had promised him a Rule 35 motion.[7] The

Defendant testified that Mr. Molloy asked that the Defendant remain at the Fayette County facility

at that time because he was assisting in certain investigations by jail officials. The Defendant

testified that he thought Mr. Molloy had filed the Rule 35 motion after the Gravley trial and that it

was pending at this time.

The Defendant acknowledged that he wrote to Mr. Molloy on September 7, 2011, and that

his letter contained the following statement: "Enclosed is a copy of a letter my lawyer sent to the

prosecuting attorney's office in Nashville." (Docket No. 875-8, at 3 of 4). The Defendant denied

that he was referring to one of Mr. Tennent's letters requesting the filing of a Rule 35 motion. The

Defendant also acknowledged that the letter stated:

> I know at this point it's very limited as to what you can do. Mr. Malloy, I continue
> to need your help. If you can find it in your heart to continue to assist me, I promise
> that your assistance will not be in vain.

(Id., at 3). The Defendant testified that this statement was referring to his desire to stay at the

Fayette County jail.

The Defendant also acknowledged sending a letter of apology to AUSA Koshy on

September 15, 2011. (Docket No. 791-9). In the letter, the Defendant states that his reason for

writing is "to express to you my deepest most sincere apology, to share with you the person I've

become since my incarceration, as well as, ask you for a second chance to re-enter society to

become a productive citizen." (Id., at 1 of 2). Later in the letter, the Defendant states: "Mr. Koshy,

I come to you as humble as I can be asking you for another opportunity to enter society and become

the productive citizen I desire to be." (Id., at 2 of 2).  The Defendant denied that these statements

---

[7]  Mr. Tennent denied this assertion and stated that he would have put this in his notes if
the Defendant had said it.

undermined his testimony that he thought Mr. Molloy had already filed a Rule 35 motion and that Mr. Koshy would not be involved in the process. The Defendant testified that this letter was not an attempt to persuade Mr. Koshy to file a Rule 35 motion; rather, he wanted to work with Mr. Koshy to try and help clean up the community.

The Defendant denied receiving a copy of the first two letters Mr. Tennent sent to United States Attorney Jerry Martin, requesting that a Rule 35 motion be filed on the Defendant's behalf. The Defendant testified that, during that time, he was incarcerated at Atwater and did not receive the letters until he was transferred to Marion, in late 2011 or early 2012. According to the Defendant, up until that time, Mr. Tennent had never indicated to him that he was trying to persuade the U.S. Attorney in Nashville to file a Rule 35 motion on his behalf. When he received the letters, the Defendant said they upset him because he thought he already had a deal.

According to the Defendant, he repeatedly told Mr. Tennent that Mr. Molloy had promised a Rule 35 motion and to review the rebuttal transcript. After he reviewed the motion to compel filed by Mr. Tennent, in September, 2012, the Defendant said he asked Mr. Tennent why it did not include his "promise" argument. According to the Defendant, Mr. Tennent said he did not want to throw Mr. Molloy "under the bus."

The Defendant admitted that he had been charged in his criminal case with engaging in large-scale drug trafficking for six years, that he became a fugitive after being indicted, and that he had talked on the phone with a plastic surgeon about changing his appearance. The Defendant testified that he and a jailhouse lawyer wrote his plea agreement because it got him a better deal that his attorney could obtain. The Defendant admitted that he violated the terms of his plea agreement by failing to disclose everything he knew and by perjuring himself in grand jury proceedings. The Defendant disagreed with Judge Wiseman's finding that he had tried to persuade

witnesses to lie at his sentencing hearing. The Defendant also denied that he lied when he testified in his Section 2255 proceeding that he had sex with his girlfriend between four and seven times in the DEA conference room with the knowledge and agreement of his attorney, a DEA agent, and AUSA Koshy.

The Defendant acknowledged that he had taken an active role in his past court proceedings. The Defendant also acknowledged that he had been unable to successfully work with Mr. Tennent and three other attorneys in this case since his motion to compel had been filed. Nevertheless, the Defendant admitted that he did not write to the court to raise the "promise" argument, even though he claims Mr. Tennent repeatedly refused to make the argument on his behalf.

2. *The Court's Conclusions*

The evidence adduced at the hearing reflects a clear factual dispute between the parties as to whether Mr. Molloy promised to file a Rule 35 motion in exchange for the Defendant's rebuttal testimony. Having fully considered that evidence, the court is persuaded that Mr. Molloy did not make such a promise. First, the Defendant's own words and conduct undermine his position that Mr. Molloy made such a promise. On September 7, 2011, *after* the Defendant says he believed the Rule 35 motion had already been filed by Mr. Molloy, the Defendant sent him a three-page, single-spaced letter, which describes in detail his rehabilitation and concludes by stating:

> I know at this point it's very limited as to what you can do. Mr. Malloy, I continue to need your help. If you can find it in your heart to continue to assist me, I promise that your assistance will not be in vain.

(Docket No. 875-8, at 3). The Defendant's explanation for this statement – that he was talking about his desire to stay at the Fayette County jail – is not credible in the context of the entire letter. A more reasonable interpretation is that the Defendant was hoping to persuade Mr. Molloy that he is deserving of assistance in obtaining a yet-to-be-filed motion to reduce his sentence. The

Defendant's postscript, indicating that he intends to send a letter of apology to AUSA Koshy, suggests that the Defendant knew Mr. Koshy would be involved in filing such a motion. The court is not persuaded that the Defendant's position is proven by the statement in the letter thanking Mr. Molloy for all he has done in "securing my safety and filing the Rule 35." In the context of the entire letter, a more reasonable interpretation of this statement is that the Defendant seeks to express appreciation for Mr. Molloy's having *recommended* the filing of a Rule 35 motion, which may, in fact have been what Molloy promised to do.

Even more persuasive is the content of the Defendant's letter to Mr. Koshy, dated roughly a week later. In that two-page, single-spaced letter, the Defendant again describes in detail his rehabilitation and states that his purpose is to "ask . . . for a second chance to re-enter society to become a productive citizen." (Docket No. 791-9, at 1 of 2). Later in the letter, the Defendant again states that he is "asking you for another opportunity to enter society and become the productive citizen I desire to be." (Id., at 2 of 2). If the Defendant believed Mr. Molloy had already filed the Rule 35 motion, and that Mr. Koshy had no role in that process, there is no reason for the Defendant to seek Mr. Koshy's help in "re-entering society." Furthermore, with a life sentence, the Defendant would not be "re-entering society" in the absence of a sentence reduction. The Defendant's explanation for these statements – that he was talking about working with Mr. Koshy to help clean up the community – is simply not credible in the context of the entire letter, and given the Defendant's asserted belief that Mr. Koshy hated him.

On the other hand, the transcript of the rebuttal testimony, relied on so heavily by the Defendant, does not inevitably lead to the conclusion he advances. First, the purpose for the questions Mr. Molloy asked about the filing of a Rule 35 motion was not to nail down the terms of a cooperation agreement, but rather to disclose to the jury any possible bias on the part of a

government witness. Discussing the role of the home prosecutor was not necessary to achieve that purpose, given that the process for obtaining a Rule 35 sentence reduction had already been thoroughly explained to the jury during the testimony of three other inmate witnesses during the case-in-chief. It was not necessary to discuss the process in detail a fourth time in order for the jury to evaluate the Defendant's credibility. Moreover, the Defendant's own description of the Rule 35 process during the exchange does not reflect that an unconditional promise had been made. The Defendant indicated that he "anticipate[s] or hope[s]" to receive a Rule 35, and that the Government had not "made any promises."

The Defendant maintains that he would not have testified on rebuttal, even if he were to be held in contempt, if Mr. Molloy had not unconditionally promised to file a Rule 35 motion.[8] The court is not persuaded, however, that Mr. Molloy would have considered the Defendant's testimony so valuable that he would make such a promise. In that regard, it is worth noting Mr. Molloy's testimony that, if the Defendant had made the Rule 35 request earlier in the process and Mr. Molloy had taken the opportunity to contact the prosecutor in this district for background information on the Defendant, he might not have called him to testify at all. That conclusion is supported by the Sixth Circuit's determination in the Gravley appeal that the Defendant's testimony, whether "true or false, was not material." *United States v. Gravley*, 587 F. App'x 899, 917 (6th Cir. 2014).

To accept the Defendant's position, the court must believe that Mr. Molloy, an experienced, seasoned federal prosecutor, made an unconditional promise to do something he

---

[8]    It is unlikely that the Defendant believed his refusal to testify at this point would insulate him from retaliation by Mr. Gravley, as he had already testified against Mr. Gravley during the case-in-chief.

clearly knew he could not do – file a Rule 35 motion in another district in another state – prior to hearing the Defendant's testimony or fully assessing the value of his assistance. The court must also find that Mr. Molloy knowingly presented perjured testimony by the Defendant that no promises had been made to him. The court must also believe that the Defendant thought, for some eight months after the Gravley trial concluded, that Mr. Molloy had already filed the Rule 35 motion and was unaware of the repeated requests and recommendations for Rule 35 relief that were being made on his behalf to the prosecutors in this district by Mr. Molloy and Mr. Tennent. The evidence as a whole simply does not support these conclusions.

For these reasons, the court finds that the Government, through Mr. Molloy, did not bargain away its discretion to file a Rule 35(b) motion on the Defendant's behalf. Accordingly, the Defendant's Motion To Compel The Government To File A Rule 35(b) Motion To Reduce Defendant's Sentence Due To Provision Of Extraordinary Assistance In the Investigation And Prosecution Of Dangerous Crime (Docket No. 788) is DENIED.

ENTER this 8th day of January 2018.

_____
ALETA A. TRAUGER
U.S. District Judge